*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PAMELA LYONS, Personal Representative of the
ESTATE OF GERALD MOSS,

        Plaintiff-Appellant,

v

DR. SAILAJA DATLA,

        Defendant,

and

WILLIAM BEAUMONT HOSPITAL-GROSSE
POINTE, doing business as BEAUMONT HEALTH
SYSTEMS,

        Defendant-Appellee.

UNPUBLISHED
December 22, 2022

No. 354516
Wayne Circuit Court
LC No. 15-015546-NH

Before: CAVANAGH, P.J., and K. F. KELLY and GARRETT, JJ.

PER CURIAM.

Gerald Moss (Moss) brought this medical malpractice action against defendants, Dr. Sailaja Datla and William Beaumont Hospital-Grosse Pointe, after he went into cardiac arrest while a patient at defendant's hospital, resulting in permanent injuries. The case proceeded to trial solely against the hospital (hereinafter "defendant"). A jury found that defendant did not breach the applicable standard of care and the trial court entered a judgment of no cause of action. This Court granted plaintiff's application for a delayed appeal. Moss died on March 31, 2021, and Pamela Lyons, the personal representative of Moss's estate (plaintiff), has been substituted as the plaintiff in this matter. We affirm.

## I. BACKGROUND FACTS

On June 1, 2013, after being taken to the emergency department at defendant's hospital, Moss was admitted to the hospital with a primary diagnosis of acute alcoholism. Moss had a

history of alcoholism that led to multiple other medical conditions. Just months before this visit, Moss was treated for obstructive sleep apnea, but that information was not in his medical records when he arrived at the hospital in June 2013.

In the early morning hours of June 4, 2013, Moss began receiving treatment for his alcoholism under the Chronic Intoxication Withdrawal Assessment (CIWA) protocol, which is a nurse-driven plan for addressing alcohol withdrawal on the basis of the patient's symptoms. A nurse is required to pay attention to the patient's symptoms to provide proactive care under this protocol. To treat his withdrawal symptoms, Moss was given the medication Ativan, also known as Lorazepam. A known side effect of Ativan is that it can cause respiratory depression, particularly in patients who suffer from obstructive sleep apnea.

Nurse Tiffany Poirier cared for Moss during the night shift from late on June 4, 2013, into the early morning hours of June 5, 2013. A physician last saw Moss on June 4 at approximately 11:10 p.m. After Moss began receiving Ativan, his pulse oxygen saturation levels decreased and Poirier provided him with supplemental oxygen, which immediately increased his pulse oxygen saturation level. There was no continuous pulse oximeter monitor available in the stepdown unit where Moss was placed, but Poirier checked Moss's levels three times during her shift.

At approximately 5:06 a.m., Poirier contacted a physician because she was concerned that Moss's blood pressure was high. At approximately 5:16 a.m., Moss went into cardiac arrest. According to multiple witnesses who viewed Moss's telemetry records, Moss was asystole at approximately 5:18 a.m. and chest compressions began at 5:19:15 a.m. Other records of the cardiac event suggested a longer delay between when asystole occurred and when cardiopulmonary resuscitation (CPR) commenced. Additional measures had to be taken to counteract Moss's medications and a pulse was not reestablished for many minutes, which resulted in permanent damage.

Moss's theory at trial was that because he was receiving Ativan and also suffered from obstructive sleep apnea, his breathing should have been continuously monitored due to the side effect of taking Ativan. While he was on a heart monitor, he was not on a continuous pulse oximeter to monitor his pulse oxygen saturation levels. Moss claimed that the standard of care required that he receive both heart and pulse oxygen monitoring. Moss alleged that Poirier breached her duty of care by failing to implement or advocate for continuous pulse oximetry for Moss. Moss further claimed that there was a delay in beginning CPR, which impeded his recovery from the cardiac arrest and caused permanent injuries. Moss's theory was that, according to defendant's records, the telemetry unit monitoring Moss's heart at another location alerted Poirier at 5:15 a.m. that Moss's heart had stopped beating, but that a "code blue" was not called until 5:20 a.m., and CPR did not commence until 5:26 a.m., which was too long of a delay under the standard of care and resulted in Moss's brain being deprived of blood and oxygen.

Defendant offered evidence that Moss's cardiac arrest was caused by irregular heart rhythms attributed to his withdrawal from alcohol use and delirium tremens, not from the use of Ativan. Defendant also relied on the actual telemetry strip records of Moss's heart activity, which defendant argued showed that Poirier and other staff timely responded within 75 to 80 seconds after Moss became asystole and promptly began CPR. The jury returned a special verdict in which it found that Poirier did not breach the standard of care in one or more ways as claimed by Moss.

## II. MISTRIAL

Plaintiff argues that the trial court erred by denying Moss's motion for a mistrial on the basis of an allegedly prejudicial remark by the trial court. "Whether to grant or deny a mistrial is within the discretion of the trial court and will not be reversed on appeal absent an abuse of discretion resulting in a miscarriage of justice." *Veltman v Detroit Edison Co*, 261 Mich App 685, 688; 683 NW2d 707 (2004). We conclude that the trial court did not abuse its discretion by denying Moss's motion.

During plaintiff's counsel's examination of Poirier at trial, counsel asked Poirier if she would have taken any action to have Moss placed on continuous pulse oximetry monitoring if she knew that he was previously diagnosed with obstructive sleep apnea. Poirier testified that she needed a doctor's order to place him on continuous pulse oximetry monitoring and, if she had any concerns, she would have called the doctor to discuss the need for continuous pulse oximetry monitoring. Poirier confirmed, in response to a question from the trial court, that increasing doses of Ativan, in combination with a history of sleep apnea, would have prompted her to contact the doctor to suggest that continuous pulse oximetry be ordered. Plaintiff's counsel followed up on the court's question in the following exchange:

*(BY MR. LEE [plaintiff's counsel] (continuing))*:

   *Q*. You would have suggested to the doctor that they implement continuous pulse oximetry?

   *A*. Right, if I had known that information and had been concerned, I would have definitely collaborated with the doctor.

   Q. Well, you would have corroborated with the doctor and said, I think this man is as an appropriate candidate for continuous, not—

   *THE COURT*: Counsel, counsel, she answered the question.

   *MR. LEE*: Okay, I'll move on.

   *THE COURT*: *Just in terms of thinking, she's the nurse. The doctor is the doctor. The nurse is supposed to tell the doctor how to do their job*?

   *MR. LEE*: Well, that's a good question, Judge, so let, let me ask this.

*(BY MR. LEE (continuing))*:

   *Q*. Ms. Poirier, we know you were providing care pursuant to a CIWA protocol, right?

   *A*. Correct.

   *Q*. Okay.

But your job was not to just decide how much Ativan to give. It was a much more expansive role than that, was it not? [Emphasis added.]

*A.* Well, in order to decide, you would assess your patient for symptoms.

Shortly thereafter, after the jury and the witness exited the courtroom, plaintiff's counsel explained that he was trying to show that Poirier's role was not simply to follow a doctor's orders:

*MR. LEE*: The underlying basis—and by the way, Mr. Jost said to you when we were at the bench, that you denied a motion or you granted their Motion in Limine To Preclude New Claim (sic). You absolutely and it's in the order, said that we could pursue this claim, that it was a breach of the standard of care, not to put Gerald Moss on continuous pulse oximetry. That's our claim.

I have to be able to explain to the jury why the standard of care required that he be put on—

*THE COURT*: I'm—you know what I'm having a hard time with? Is you're, basically, you're saying that this nurse had that duty, when so far to me it seems like the doctors had the duty.

*MR. LEE*: Well—

*THE COURT*: I don't—to me you're putting a lot of—yeah, nurses spend most of the—everybody, you know, we all have been in the hospitals. And we know the nurses are the first line of care. They have a number and I've said this from the—they have another number of patients that they're going to see, and they and most people don't like you coming to check on them every 20 minutes because they come in and do what they have to do.

It seems to me, what you're trying to do is say that the nurse should have ordered the doctor to get the continuous pulse.

*MR. LEE*: No.

*THE COURT*: But if that's the case, don't you need a nursing expert to say, 'cause to me I don't think this witness is qualified—this witness can say what they did and what they're opinions are, but seem[s] like you would need, like, a professional person to say what the standard of care [is] for a nurse. 'Cause to me, I don't think that you should be your own expert. That to me just seems a bit—

*MR. LEE*: Judge, first of all, we do have a nurse expert—

*THE COURT*: Well, then why don't you ask those questions of that person?

*MR. LEE*: She's the Defendant. I'm allowed to ask her those questions about the standard of care. She's gonna testify she didn't breach the standard of care when Mr. Jost gets up there and starts answering—asking her questions. I

mean that's unquestionably going to happen. I need to be able to establish—Judge, are—there is testimony—

Plaintiff's counsel explained that it was their theory that Poirier was not obligated simply to follow the doctor's orders, but was also required to make her own assessments and evaluations, such as recognizing that Moss had sleep apnea. The court responded:

*THE COURT*: But she still can't order the doctor to put him on a continuous—'cause you made it seem like—I'm not just going to say practically. That a two year experienced nurse is going to tell a doctor. Doctor, based upon my, you know, experience and training, this person should have continuous, you know . . .

*MR. LEE*: Well, I think she said that to an extent already. That if the person, if she knows they've got sleep apnea, and if they're on Ativan and if they got low 02 stats that she would make that recommendation.

I'm taking it a step further and saying, she needs to not make the diagnosis, but at least be thinking about that based upon the constellation of signs and symptoms, based upon this patient's signs risk factors for having sleep apnea. That his body is, usually when a person has sleep apnea is, yes that is all within the purview and scope of a nurse.

*THE COURT*: And so, just so I can answer your question, so the hypertension doesn't play into that all?

*MR. LEE*: Judge—

*THE COURT*: I'm asking you, I'm asking you?

*MR. LEE*: No, no, it doesn't.

*THE COURT*: I disagree.

*MR. LEE*: Well, Judge—

*THE COURT*: I mean I have both and, so and I've been—so they usually do, they usually do, people with sleep apnea often have hypertension. They go hand-in-hand and I'm not just talking about me. I'm just talking about from talking to doctors about it, which is why they tried—you know so, that person is under more pressure for heart attacks and strokes and breathing problems.

So, that list[s] basically all of those things, obesity. All of those things when you add them all up they make you a lot—you make you [sic] a very complex patient to have to deal with.

*MR. LEE*: Now, Judge, I expect [sic, respect] you as a jurist, immensely, I do—

*THE COURT*: But you disagree with where I'm coming from now?

*MR. LEE*: Well, I—

*THE COURT*: I'm just trying to understand why you believe that this nurse should've made this—should and I'm—should have been based upon this patient with all the issues going on, should have said that the sleep apnea, that's the problem that's causing—that's going to make him a candidate or he should have to continuous—that's what I'm asking for—

Plaintiff's counsel then moved for a mistrial on the basis of the trial court's earlier remarks before the jury, whereby the court remarked that "[t]he doctor is the doctor" and asked whether "[t]he nurse is supposed to tell the doctor how to do their job?"

*MR. LEE*: Judge, with all due respect, you made a couple of comments in the presence of the jury, saying, are you saying the nurse is supposed to tell a doctor how to do his job? That is severely prejudicial to Gerald Moss, to our side.

I'm respectfully asking you to declare a mistrial because of those comments. Because I think it's been injected into the jury. It's not fair to Gerald Moss. I'm not saying a nurse should tell the doctor what to do. I'm saying a nurse, as a clinician, though has an independent—

*THE COURT*: The only reason I said it because that's basically—you were pushing her into doing that.

You, you—no, no, we can go back. I'm not declaring a mistrial. The only reason I said that because of your questioning, because she was trying to qualify it, and you kept pushing, pushing, pushing. Well, aren't you suppose to do that, aren't you suppose to do that. And the quickness and the way, the rate that you asked the questions, and the way that you asked them were basically pushing her [to] do that. So that's the only reason I said that.

*MR. LEE*: It's cross-examination, Judge, I mean she's, she's an adverse witness. Mr. Jost thinks she's the Defendant in this case, so—

*MR. JOST*: Well, you just said that a second ago, you said she's the Defendant.

*COURT REPORTER*: I'm sorry, You just said—you just that—

*MR. JOST*: He just said that one second ago.

*MR. LEE*: Yeah, let me show—

*THE COURT*: No, no, wait. He meant that was a misstatement. But I'm not declaring a mistrial. I'm still trying to figure out what do you want—

> *MR. LEE*: Judge, I just want to be able to ask a few more questions about what an assessment entails, under the standard of care. In terms of what does a nurse need to do when you come and you lay eyes on a patient for the first time?
>
> *THE COURT*: Then why don't you ask her that?
>
> *MR. LEE*: Well, because that's an open-ended question. And I'm cross-examining her. I'm allowed to ask leading questions.
>
> *THE COURT*: Yeah, but then you don't get the answer you want. To me I think it would be better to ask her an open-end questions [sic]. Then say—then pick from there what—I mean, if you want her any questions [sic], you're not going to—it's going to take us forever, that way, to get to what you want, so.
>
> *MR. LEE*: Well, with all due respect, I think it's going to take longer if I just ask her that, than the way I was asking her questions because I was just about done.

After Poirier resumed testifying before the jury, she ultimately agreed that part of her role as a nurse was to act as an advocate for her patients, which includes calling doctors, not just waiting for a doctor to tell her what to do.

Plaintiff argues that the trial court's comment to plaintiff's counsel, in which the court questioned whether a nurse is supposed to tell a doctor how to do their job, inappropriately conveyed to the jury that the court questioned the validity of Moss's case. We conclude that to the extent that the trial court's remark could be considered inappropriate, it did not deprive Moss of a fair and impartial trial.

Plaintiff cites *In re Parkside Housing Project*, 290 Mich 582, 598; 287 NW 571 (1939), in which our Supreme Court stated that "[i]t is obviously improper for a trial judge to indicate by his remarks to counsel that he has any bias or prejudice in favor of one party or the other." But "[t]he appropriate test to determine whether the trial court's comments or conduct pierced the veil of judicial impartiality is whether the trial court's conduct or comments were of such a nature as to unduly influence the jury and thereby deprive the appellant of his right to a fair and impartial trial." *City of Lansing v Hartsuff*, 213 Mich App 338, 349-350; 539 NW2d 781 (1995) (quotation marks and citation omitted).

Before Poirier testified, a nursing administrator, Linda O'Hara, testified that a nurse cannot order continuous pulse oximetry. O'Hara testified that it is up to a physician to order continuous pulse oximetry and it is not within a nurse's scope of practice to order continuous pulse oximetry monitoring on a patient. O'Hara also testified that only a physician can decide to transfer a patient from a stepdown unit to the intensive care unit (ICU) where the patient can receive continuous pulse oximetry. O'Hara agreed, however, that a nurse is permitted to contact a physician to express a concern that a patient may need to go to the ICU and may need continuous monitoring. While the physician makes the decision, the nurse caring for the patient needs to inform the physician if a patient may require different care.

Dr. Gomez, defendant's expert witness, likewise testified that an order for a patient to be placed on pulse oximetry monitoring usually comes from the physician. Denise Harrison, defendant's nursing expert, also confirmed that a nurse cannot issue orders or transfer a patient to another unit because that is the physician's responsibility.

The trial court's jury instructions included the following instruction:

> Nursing duties. A nurse does not have a duty to diagnose obstructive sleep apnea or any treatment for obstructive sleep apnea. A nurse also does not have the duty to transfer the patient to the ICU. These are not issues for you to decide in determining whether the Defendant was professionally negligent.

This instruction clarified for the jury that Poirier did not have a duty to transfer Moss to the ICU, which was the only unit where his oxygen saturation level could have been continuously monitored. This instruction was consistent with any suggestion by the trial court that Poirier was not responsible for telling the doctors how to treat Moss.

Moreover, the court's remark was not substantially antagonistic to plaintiff's theory of the case. It is apparent from plaintiff's counsel's examination of Poirier that counsel understood that Poirier was not a doctor who could unilaterally change Moss's treatment, but instead believed that Poirier should have done more to alert Moss's doctor to Moss's previous diagnosis of sleep apnea to determine whether the doctor should order continuous pulse oximetry monitoring in light of that condition and the prescribed treatment. Plaintiff's counsel was not alleging that Poirier had the ability to either order Moss to receive continuous pulse oximetry monitoring on her own or move him to the ICU. Counsel acknowledged that a doctor would have had to approve any change in Moss's treatment. Because this is the essence of what the trial court's remark conveyed, we do not believe that the court's remark was as prejudicial as plaintiff contends. The remark seems more of an effort by the trial court to clarify the basis of Moss's theory for the jury. While the trial court's tone when making the remark is not apparent from the record, the record does not support plaintiff's argument that this single, isolated comment can be considered so prejudicial that it would have unduly influenced the jury and thereby deprive Moss of his right to a fair and impartial trial. See *Veltman*, 261 Mich App at 688.

Moreover, to the extent that there was any perceived prejudice, the following instruction in the trial court's final jury instructions was sufficient to protect Moss's right to a fair and impartial trial:

> My comments, rulings—I didn't do a summary of the evidence, and instructions are also not evidence. It is my duty to see that the trial is conducted according to law and to tell you the law that applies to this case.

> However, when I make a comment or give an instruction, I'm not trying to influence your vote or express a personal opinion about the case.

> If you believe I have an opinion about how you should decide this case, you must pay no attention [to] that opinion. You are the only judges of the facts and you should decide this case from the evidence.

I'm going to say something that is not in here, just to let you know. If you believe that like, for example, there have been times when I maybe chastised the lawyer—I think I done both sides, I don't know if I did equally or not, that doesn't mean that I think that side should lose or win. It just means that, as I told you earlier, I'm like the umpire calling balls and strikes and if you believe that I have personal opinion[s] about the case, you should not take that into consideration.

Plaintiff complains that the challenged remark improperly conveyed the trial court's view of the case to the jury, which is that the court had a negative view of plaintiff's case. The trial court disagreed that it was expressing an opinion about the case when it denied the motion for a mistrial, but to the extent that the court's remark could be interpreted in such a manner, the foregoing instruction was sufficient to advise the jury to ignore any such perceived opinion. In sum, considering that the court's statement did not expressly represent an actual opinion about Moss's case, that the remark involved an isolated comment over the course of an eight-day trial, and that the jury was duly instructed to ignore any perceived expression of opinion by the court, there is no reasonable likelihood that the court's isolated remark was of such a nature as to unduly influence the jury and thereby deprive Moss of his right to a fair and impartial trial. Accordingly, the trial court did not abuse its discretion by denying the motion for a mistrial.

III. O'HARA'S TESTIMONY

Plaintiff also argues that the trial court erred by permitting O'Hara to provide expert testimony regarding her interpretation of Moss's telemetry strips when she was neither offered nor qualified as an expert witness. Although we are not persuaded that the trial court abused its discretion by permitting O'Hara's challenged testimony, we also conclude that any error related to her testimony was harmless.

A trial court's decision to admit evidence is reviewed for an abuse of discretion. *Barnett v Hidalgo*, 478 Mich 151, 158-159; 732 NW2d 472 (2007). An abuse of discretion occurs when the decision results in an outcome falling outside the range of principled outcomes. *Id*. at 158. Any preliminary questions of law are reviewed de novo. *Id*. at 159.

At trial, plaintiff called as a fact witness O'Hara, defendant's nursing administrator who responded to Moss's cardiac event and was present while Moss was given CPR. O'Hara initially explained that she had not received training on how to read telemetry strips, but then explained that she knew "some strips, because I have my ACLS[1] certification and you do learn certain rhythms that you need to know [in] code situations." O'Hara clarified that she had been trained to recognize certain heart rhythms to identify emergency situations, but not how to read or interpret an entire telemetry strip or EKG.

When defense counsel began to ask O'Hara about an exhibit that consisted of Moss's telemetry strip, plaintiff objected in the following exchange:

---

[1] ACLS is an acronym for advanced cardiac life support.

*Q*. And let's pull up, this was attached as Exhibit 2 to your deposition, it is now Joint Exhibit 201-3611.

*MR. JOST [defense counsel]*: Can we pull up this little section right in here, Mr. Mason.

*MR. HURBIS [plaintiff's counsel]*: Your Honor, before Ms. O'Hara gives testimony about what this means, I don't think appropriate foundation has been laid for her to talk about the Telemetry tracings.

*THE COURT*: Okay.

*MR. HURBIS*: We can approach and I can tell you why I believe that now, it's your preference.

*THE COURT*: Well, I'm assuming he's going to ask her a couple of more questions before we get there.

*MR. HURBIS*: I'm not sure that he is. I mean, he just pulled it up there right now. If he does ask additional foundational questions, I'll withdraw my objection. But if he's just going to ask her right now what that shows, then I do have a foundational objection based on what she said previously which was, I'm not going to be talking about these here today and her ACLS training has only allowed her to read some life-threatening conditions, not everything that's on there, things like that.

So as we stand now, I don't think an appropriate foundation has been laid.

*THE COURT*: Noted. Counsel.

*MR. JOST*: Do you want a response or should I proceed?

*THE COURT*: I'll take a response first.

*MR. JOST*: Okay. The response is, he asked her about documents that she seen at her deposition. She received these at her deposition. She testified that she's trained in ACLS, advanced cardiac life support, in reading life-threatening rhythms.

I'm going to ask her if this is one of those rhythms that she's trained to read. I'm going to lay a foundation.

If she says yes, then will ask her where the time stamps are on this document and I'll ask her what time the life-threatening rhythm occurred.

-10-

*MR. HURBIS*: Your Honor, if that's the plan, then I think respectfully, we should be given an opportunity to voir dire the witness on her training and experience in Telemetry and reading them.

She said not all life-threatening rhythms was she trained in ACLS. She said some. I don't really know what those are. I think we can all agree there's way more on there than just this short little strips for reading the Telemetry for ACLS, that's a totally different context too.

For ACLS you're looking at the leads that are on the patient before you're about to use the AED. I just don't think there's been sufficient foundation laid with this witness, especially when she said she was not going to talk about these today when I asked her.

And if Mr. Jost is now going to ask her questions about these, I don't think it's appropriate. I don't think we've laid an appropriate foundation. I think it's going to mislead the jury because I don't think she has the proper training, qualifications to do so, especially since she doesn't put her hands clinically on the patient and you very rightly told me to stay away from the standard of care opinions because of that.

*THE COURT*: Well, I'll leave that for your voir dire on her foundation experience for cross-examination. I'm going to allow him to do it. I've already let you know what could happen. I'm not saying—depending on what questions he asks, whether we will go into standard of care issues later.

O'Hara confirmed that asystole is a life-threatening heart rhythm and she knew how to identify this "flat line" event on a telemetry strip because of her ACLS training and certification and more than 50 years of experience working as a nurse. O'Hara read that the flatlining began between 5:18:15 and 5:18:33 a.m. O'Hara believed that bumps on the telemetry strip at 5:19:15 and 5:19:30 appeared to be when the CPR started.

Later, when questioned by plaintiff, O'Hara admitted that she could not address everything on an EKG or telemetry strip:

*Q*. So I just want to ask some questions about that. So I think we established, I asked you earlier, you're familiar with some rhythms because of your ACLS training, correct?

*A*. Right.

*Q*. Life-threatening rhythms, correct?

*A*. Correct.

*Q*. You obviously—I think there are some things on EKG and Telemetry strips that are better left to cardiologist[s] or folks like that, correct?

-11-

*A.* Correct.

Plaintiff argues that the trial court abused its discretion by allowing O'Hara to offer testimony regarding her reading of the telemetry strip on the morning Moss went into cardiac arrest. Plaintiff argues that this subject matter involved expert testimony for which O'Hara did not have the necessary training, skill, or knowledge to provide under MRE 702, which states:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Initially, we note that O'Hara was never offered as an expert witness under MRE 702 regarding the interpretation of telemetry strips. However, it appears that O'Hara's testimony was admissible under MRE 701, as opinion testimony by a lay witness, even though she was not qualified as an expert. MRE 701 provides that

> [i]f the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

O'Hara responded to the alarm when Moss went into cardiac arrest and resuscitation efforts were already in progress when she arrived at Moss's room. O'Hara did not provide any direct patient care, but her role was to document the efforts to resuscitate Moss. O'Hara wrote in her report that CPR started at 5:26 a.m. At trial, she explained that she arrived in the room at approximately 5:25 a.m. and should have more accurately wrote that CPR was then restarted by the staff who was treating Moss, not that the procedure commenced at 5:26 a.m.

O'Hara was properly allowed to explain to the jury that the telemetry strip showed when Moss's heart initially stopped beating, that is, when he "flatlined," and when CPR was started, to explain why her records, which stated that CPR began at 5:26 a.m., were accurate with regard to the portion of her participation in the procedure to resuscitate Moss. O'Hara was also asked to address a portion of the medical records, which seemed to state that an alarm for Moss's heart may have been triggered as early as 5:15 a.m., but CPR did not begin until 5:20 a.m. The telemetry strip was used to support O'Hara's account that she arrived when CPR was already in progress and that the medical records might have contained errors regarding the timing of Moss's cardiac arrest, which clearly involved facts at issue in this case.

Even though neither party offered O'Hara as an expert witness and she was never qualified to testify as an expert witness, the trial court ruled that defendant would be required to establish a foundation for O'Hara's testimony and that plaintiff would be permitted to explore the foundation for her testimony on cross-examination. O'Hara agreed that she was not qualified to interpret all matters related to telemetry strips, but explained that she had received training and experience to

identify certain significant events represented on the strips, and was able to read the events that were the subject of her testimony. Accordingly, MRE 701 supports the admission of her testimony. To the extent that the admissibility of O'Hara's testimony under MRE 701 may be considered a close question, a trial court's decision on a close evidentiary question generally does not fall outside the range of reasonable and principled outcomes. See *Andreson v Progressive Marathon Ins Co*, 322 Mich App 76, 90; 910 NW2d 691 (2017).

We also disagree with plaintiff that O'Hara's testimony should have been excluded because defendant misled plaintiff during discovery regarding O'Hara's proposed testimony. Although plaintiff asserts that defendant repeatedly represented that O'Hara was not going to testify as an expert witness, that is not inconsistent with what occurred at trial. O'Hara was present during Moss's cardiac event and resuscitation efforts, she provided limited opinion testimony regarding the interpretation of the telemetry strips that were generated at that time, and defendant established a foundation for her testimony by demonstrating that she had the training and experience to identify the portions of the telemetry strips that depicted the events that were the subject of her testimony.

However, even if the trial court abused its discretion by admitting O'Hara's opinion testimony regarding what the telemetry strips showed, we are satisfied that the error was harmless. An error in the admission of evidence does not require reversal where it is not more probable than not that the error was outcome-determinative. *Barnett*, 478 Mich at 172; see also MCR 2.613(A) ("An error in the admission . . . of evidence . . . is not ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take this action appears to the court inconsistent with substantial justice."). In this case, the interpretation of the telemetry strips did not hinge on O'Hara's testimony. Rather, there was substantial additional testimony at trial regarding the significance and interpretation of the telemetry strips.

Dr. Gomez, one of defendant's expert witnesses, using the same exhibit shown to O'Hara, testified that Moss was asystole at 5:18 a.m. Dr. Gomez explained that CPR started when the telemetry strip showed up-and-down actions depicting chest compressions at 5:19:15. Dr. Gomez described the strip as showing "very characteristic CPR waves." He also believed that someone who cared for patients in an emergency room would recognize those indications on a telemetry strip fairly rapidly.

Denise Harrison, a defense expert in nursing, explained that nurses in a stepdown unit are required to read and interpret EKG strips. The nurse will pull the strip from the monitor and post her interpretation of the strip into the patient's chart. Nursing students and nurses within a hospital are taught how to read and interpret EKG strips. Nurses who become ACLS certified know how to identify the particular heart rhythms on a strip and how to intervene if there is a life-threatening arrhythmia. Nurses who are ACLS certified are taught how to read the strips when CPR is performed because they need to know how fast or efficiently someone is performing CPR.

In her testimony, Harrison described what Moss's telemetry strip showed:

> *A.* There it is. So it looks like at 5:17:30, we can see the patient is definitely bradycardic. He has a period of asystole. Again, this is when there's no heart rate. Has few beats on their own.

Again, [5:]17:30, the asystole alarm goes off and yet he's still somewhat severely bradycardic here. At 5:18, again, showing definite periods of asystole. A couple of heart beats, but definitely periods of asystole.

And here he becomes totally asystolic. So at 5:17:30 is when the asystole alarm went on. And at 5:18 he's pretty much asystolic at 5:18:15 right here.

At 5:19:15, which is about 75 seconds from the period of total asystole 5:19:15, we can see this lead, which means a particular lead, it's an angle that the machine is looking at the heart, where we see CPR beginning right here. And that's what we see as those kind of humps right here.

So from the asystolic alarm to where those—where CPR begins, is about one minute and 49 seconds from the alarm to CPR, but from the actual point of total asystole, it is about 75 seconds.

Dr. William Leuchter, another defense expert, was asked to identify the telemetry strip when Moss was asystole, which was at 5:18:30, and when cardiac resuscitation began, which was at 5:19:15.

Dr. Dan Fintel, a cardiologist who was called by plaintiff as a rebuttal witness to address the interpretation of the telemetry strips, acknowledged that a nurse may know how to read telemetry strips, even if a cardiologist would have a better understanding of this technology:

*Q*. A nurse, a neurologist or an emergency room physician, do they have in your opinion, as much training and experience in reading EKG strips?

*MR. JOST*: Objection. Calls for speculation on what the training of those particular physicians were, whether they do it everyday [sic].

*THE COURT*: I'll allow him to answer it.

\* \* \*

*A*. . . . And my answer to the question is, all of the physicians, nurse groups you talked about read Telemetry strips, but a cardiologist has the greatest training and experience in interpreting the biological and clinical significance of what those Telemetry strips show, but I'm not here stating that a nurse or a neurologist, ER doctor can't look at a Telemetry strip, of course they do.

Dr. Fintel believed that the strips showed that Moss's heart began to slow down around 5:16 or 5:17, while at 5:18 and 5:19 there was "essentially electrical silence," so Moss did not suffer a sudden abrupt event that stopped his heart from beating, but it slowed over the span of a minute. Dr. Fintel agreed that Moss was asystolic at 5:18:30 and 5:18:45. At 5:19, the strip showed pulseless electrical activity, or the heart no longer contracting. Dr. Fintel believed that the rhythmic waves that appeared at 5:19:30 were likely more pulseless electrical activity of the heart and not the beginning of CPR because the pressure was too slow, about 80 to 90 beats per minute,

not 100 beats per minute. Dr. Fintel disagreed that Poirier and others responded within 75 to 80 seconds of when Moss was asystole. However, Dr. Fintel conceded that if a witness testified that CPR was performed at the points that he believed there was pulseless electrical activity of the heart, he would not dispute that testimony because he agreed that the telemetry strips do not "lie."

Considering the many other witnesses who offered testimony regarding Moss's telemetry strips, including testimony that was consistent with O'Hara's testimony regarding when Moss began to "flatline" and when CPR commenced, it is not more probable than not that O'Hara's testimony likely affected the outcome. Accordingly, any error related to this limited testimony by O'Hara is not grounds for reversal. See *Barnett*, 478 Mich at 172; see also MCR 2.613(A).

Affirmed.


/s/ Mark J. Cavanagh
/s/ Kirsten Frank Kelly
/s/ Kristina Robinson Garrett